UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EMPLOYEE PAINTERS TRUSTS HEALTH AND WELFARE TRUST FUND,<br><br>Plaintiff,<br><br>v.<br><br>SCHMUCK BROTHERS, INC., et al.,<br><br>Defendants. | Case No. C08-0279-JPD<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter came before the Court for a bench trial on April 27, 2009. Based on the testimony and the parties' evidence, the Court makes the following findings of fact and conclusions of law.

I.     FINDINGS OF FACT

A. <u>The Parties</u>

Plaintiff Employee Painters Trusts Health and Welfare Trust Fund ("Trust Fund") is an organization created pursuant to § 302(c)(5) of the Labor-Management Relations Act, 29 U.S.C. § 186(c)(5), and is operated and governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Its essential purpose is to receive and administer health care contributions from employers who have entered into collective

bargaining agreements ("CBAs") with unions that call for contributions to a health and welfare fund.

Defendant Schmuck Brothers, Inc. ("Schmuck Brothers") is a painting contractor in the Vancouver, Washington-Portland, Oregon area. Defendant Bruce Sanders has been the owner and president of Schmuck Brothers since October 1981. Since at least that time, Schmuck Brothers has been a signatory to a CBA with its employees, who are members of Local Union No. 10. During the relevant time period, all of Schmuck Brothers' employees were covered by the CBA, with the exception of three non-bargaining unit employees, including Mr. Sanders. As part of the CBA, Schmuck Brothers is required to make health and welfare contributions on behalf of all of its bargaining unit employees.

B. The Flat Rate Agreement

Because the Trust Fund covers a large group of bargaining unit employees, it can obtain the benefits of pooled risk for health insurance coverage. The same could not always be said of the non-bargaining employees. As a result, the Trust Fund entered into what is called a Special Agreement for Participation ("Flat Rate Agreement" or "Agreement") that allows participating employers' non-bargaining unit employees to obtain health benefits through the Trust Fund. Schmuck Brothers has taken advantage of the Flat Rate Agreement to provide medical coverage for Mr. Sanders and his wife since October 1981. To do so, Schmuck Brothers would submit a form each month, indicating the name of the non-bargaining unit employee covered (here, Mr. Sanders), along with the monthly contribution amount.

Due to concerns that participating employers in the Flat Rate Agreement program were not paying for all non-bargaining unit employees and that the language of the Flat Rate Agreement could be considered vague regarding this requirement, in early 2004, the Trust Fund revised the Agreement. The Trust Fund sent each participating employer a copy of the revised Flat Rate Agreement and asked that all employers sign, date, and return the Agreement if they wished to continue to participate. If an employer did not want to continue to participate,

the employer could opt out without penalty by not signing and returning the revised Agreement.

On April 30, 2004, Mr. Sanders signed and dated the revised Flat Rate Agreement. *See* Joint Exhibit ("Jt. Exh.") No. 2. Mr. Sanders then returned the signed Agreement to the Trust Fund, which received it on May 3, 2004. *Id.* Sometime thereafter, but on an unknown date, the co-chairman of the Trust Fund, Timothy Bendokas, and the secretary of the Trust Fund, Ronald Krebbs, executed the Flat Rate Agreement. *Id.*

The 2004 revised Agreement signed by Mr. Sanders has the following key provisions:

> The Employer agrees that it shall make contributions for ALL its non-bargaining unit employees who work at least 80 hours or more per month and acknowledge this is an obligation under this Agreement.

*Id.*, ¶ 1 (emphasis in original).

> The Effective Date of coverage for non-bargaining unit employees shall be the first day of the month following the date of the Union Recommendation (below) and receipt of the full amount of required contributions, provided however that actual eligibility shall not be approved until this Special Agreement is approved by the Board of Trustees and executed by its duly authorized officers.

*Id.*, ¶ 5.

On the page of the Flat Rate Agreement immediately following Paragraph 5, there is a section entitled "Union Recommendation." *Id.* On the Flat Rate Agreement signed by Mr. Sanders, this section is completely blank. *Id.* Among other things, there is no name, signature, or date in the "Union Recommendation" section. *Id.* There is no indication it had been accepted, and a copy of the Agreement, even in its non-completed form, was not sent back to Mr. Sanders prior to the audit notice he received in September 2007.

The "Union Recommendation" section is included in the Agreement so that the Trust Fund can determine whether the applicable employer is a signatory to a valid CBA, because an

employer must be a signatory to a valid CBA to participate in the Flat Rate Agreement. In addition, Paragraph 4 of the Agreement provides that coverage under the Agreement can be terminated if an employer is delinquent in paying contributions pursuant to the CBA. *Id.*, ¶ 4. As a result, the Union's Recommendation, acknowledgement, or acceptance of some type is required to give effect to the Agreement.

### C. James Sanders and Gilbert Kerr

At the time Mr. Sanders signed the new Flat Rate Agreement, Schmuck Brothers had three non-bargaining unit employees: Mr. Sanders himself (who also sought and obtained coverage for his wife), James Sanders, the son of Mr. and Mrs. Sanders and a management employee, and Gilbert Kerr, who was also management employee who had invested in the company. James Sanders continues to work with Schmuck Brothers as a non-bargaining unit employee and Mr. Kerr retired in 2005. Prior to the 2004 revised Flat Rate Agreement, Schmuck Brothers paid for coverage under the Flat Rate Agreement for Mr. Sanders (and his wife). Schmuck Brothers independently paid James Sanders' health insurance expenses, and Mr. Kerr was covered through his wife's health insurance policy, so Schmuck Brothers paid him 80% of the health insurance contribution on his payroll check.

The Trust Fund operates on an "honor system," relying upon "Employer's Contribution Report" forms, which are monthly coverage statements submitted to the Trust Fund by participating employers (Jt. Exh. No. 5), but conducts audits to ensure compliance. In 2007, the Trust Fund audited Schmuck Brothers. At that time, it discovered that Schmuck Brothers was not paying for coverage of James Sanders and Mr. Kerr. It sent a demand for payment of $25,576.00 in employee benefit contributions for the period from July 1, 2004 to June 30, 2007 for James Sanders and Mr. Kerr. *See* Jt. Exh. No. 4. Defendants claimed the revised Flat Rate Agreement was not effective, because, despite Mr. Sanders' requests about its status, it was never returned to him, and Schmuck Brothers never received the prerequisite Union endorsements.

### D. Mr. Sanders is Not Given Notice of Acceptance or an Effective Date.

After Mr. Sanders mailed the signed Agreement to the Trust Fund, he waited for "additional instructions" but never heard anything back from the Trust Fund. His understanding was that all his non-bargaining unit employees would not be eligible for health coverage under the Agreement until the Union and the Board of Trustees each signed and approved the Agreement. He was also waiting for notification of an effective date of the Agreement because he understood that the effective date triggered his obligation to report and make contributions to the Trust Fund on behalf of his son and Mr. Kerr. Mr. Sanders understood that the Agreement did not become effective until the Union recommended the Agreement, the Board approved the Agreement, and Schmuck Brothers began paying the contributions on behalf of his son and Mr. Kerr.

However, the Trust Fund never sent a fully executed copy of the Flat Rate Agreement to Mr. Sanders, nor did it otherwise notify Mr. Sanders of an effective date of the Agreement. The Trust Fund did not tell Mr. Sanders that his Flat Rate Agreement had been approved or accepted, or that all his non-bargaining unit employees were now covered under the Agreement. The Trust Fund's administrator, Zenith Administrators, also has no record of any correspondence between the Trust Fund and Schmuck Brothers after Mr. Sanders signed and returned the Agreement.

Mr. Sanders asked Tim Carrier, a business representative for the Union, about approval of Schmuck Brothers' Flat Rate Agreement on at least two occasions at Trust Fund meetings. Mr. Carrier told Mr. Sanders words to the effect that the Agreement "hadn't been acted on yet," and not to worry about it because it would be coming. While Mr. Carrier does not have a specific recollection of such a conversation with Mr. Sanders, he has always known Mr. Sanders to be an honest person.

Because Mr. Sanders never received any communication about the Agreement after he signed it and returned it to the Trust Fund, he kept doing what he had done since October 1981

when he bought the company, which was to report and make contributions only for himself and his wife. To this day, Schmuck Brothers continues to only make contributions to the Trust Fund for Mr. Sanders and his wife. In addition, after the 2004 revised Flat Rate Agreement, Schmuck Brothers continued to pay James Sanders' health insurance expenses independently and pay Mr. Kerr 80% of the health insurance contribution directly on his payroll check until he retired.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

Pursuant to 28 U.S.C. § 636(c), the parties have consented to having this matter heard by the undersigned Magistrate Judge. Dkt. No. 12. The Court has jurisdiction pursuant to § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185(a) and §§ 502(a)(3) and 502(e)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), and 29 U.S.C. §§ 1132(a)(3) and 1132(e)(2).

### B. The Applicable Law

To prevail on a breach of contract claim, a plaintiff must demonstrate the existence of an enforceable contract, a material breach of that contract, and resulting damage. *See St. John Medical Ctr. v. Dep't of Social and Health Services*, 110 Wn. App. 51, 64 (Wash. Ct. App. 2002). In determining whether a contract exists, "[c]ontract terms are to be given their ordinary meaning, and whenever possible, the plain language of the contract should be considered first." *Yang Ming Marine Transp. Corp. v. Okamoto Freighters LTD.*, 259 F.3d 1086, 1092 (9th Cir. 2001) (internal quotations omitted). When the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1549 (9th Cir. 1990). "A written contract must be read as a whole and every part interpreted with reference to the whole." *Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983). In addition, "[p]reference must be given to

reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory." *Id.*

Acceptance of a contract requires a party's manifestation of an intent to consent to the terms of that contract. 1-3 CORBIN ON CONTRACTS § 3.28. Acceptance of a contract can occur in a variety of ways, but ordinarily acceptance occurs by overt action, such as by words or by conduct. *Id.*, § 3.8. While notice of acceptance is not in every circumstance a necessary requirement to the creation of a contract, if the contract is of such a kind that a party needs to know of the other party's acceptance in order to plan for performance or other subsequent action, a notice of acceptance must be given. *Id.*, § 3.13.

### C. There Was Not an Enforceable Agreement Other Than for Mr. and Mrs. Sanders.

Here, the Court concludes that there was not an enforceable agreement between the parties for the period from July 1, 2004 to June 30, 2007 for coverage other than for Mr. and Mrs. Sanders. While Mr. Sanders executed and returned the Agreement to the Trust Fund, the evidence shows that from Defendants' vantage point, nothing happened thereafter with respect to the Agreement. While Plaintiff operates on an "honor system," which is commendable, in light of the plain language of the Agreement which requires conduct by both parties in order to effectuate its terms, and more particularly in light of Mr. Sanders' status requests to the Union, the Court finds that Mr. Sanders was not given notice during the time period at issue that the necessary approval of the Union and Trust Fund had been given and that the Agreement had thereby been accepted. The parties' subsequent conduct indicates that the Agreement was effective as to Mr. and Mrs. Sanders because Schmuck Brothers continued to make health insurance contributions for them and the Trust Fund continued to pay their medical expenses.

The Flat Rate Agreement provides that "[t]he Effective Date of coverage for non-bargaining unit employees shall be the first day of the month following the date of the Union Recommendation (below)" and that "actual eligibility shall not be approved until this Special

Agreement is approved by the Board of Trustees and executed by its duly authorized officers." Jt. Exh. No. 2, ¶ 5. Based on this language, Mr. Sanders reasonably understood that the Agreement did not become effective until the Union recommended the Agreement and the Board of Trustees approved it. He also reasonably understood that all his non-bargaining unit employees would not be eligible for health coverage under the Agreement until those actions occurred. At least until receipt of the audit report, he was not provided any notice that the Union recommended and the Board of Trustees approved the Agreement. Mr. Sanders inquired of Mr. Carrier on two separate occasions about approval of the Flat Rate Agreement, but was told words to the effect that the Agreement "hadn't been acted on yet." In view of the foregoing evidence, Mr. Sanders reasonably concluded that the 2004 revised Flat Rate Agreement had not been accepted and given effect.

Moreover, the evidence shows that prior to the audit report, the Union did not, in fact, recommend the Flat Rate Agreement signed by Mr. Sanders, as the "Union Recommendation" section is completely blank. *See* Jt. Exh. No. 2. Therefore, by its plain language, the Agreement's Effective Date did not occur during the relevant time period. To hold that Mr. Sanders nonetheless owes additional contributions for the relevant period would render the Agreement illusory because the plain language of the Agreement would impose obligations on Schmuck Brothers with no corresponding obligation on the Trust Fund.

Plaintiff counters that since Mr. Krebbs signed the Flat Rate Agreement on behalf of the Trust Fund, and Mr. Krebbs is a Union official, the "Union Recommendation" section in this instance is basically surplusage and did not need to be completed by the Union. However, whether or not that is the case is irrelevant: Defendants still were not provided notice of the Board of Trustees' and Union's approval (however it was effected) of Schmuck Brothers' Agreement, and the date on which it occurred. Given the evidence, Mr. Sanders cannot reasonably be expected to make additional contributions to the Trust Fund under the Agreement until he is notified of the Agreement's acceptance and Effective Date.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 8

1       The Flat Rate Agreement also provides that the Effective Date of coverage shall not
2 occur until "receipt of the full amount of required contributions . . . ." Jt. Exh. No. 2, ¶ 5.
3 Based on this language, Mr. Sanders reasonably understood that his son and Mr. Kerr were not
4 being covered under the Flat Rate Agreement: Mr. Sanders had not made any contributions to
5 the Trust Fund for his son and Mr. Kerr because he had not received notice of the Agreement's
6 Effective Date. As a result, Mr. Sanders continued to what he had done before, which was to
7 independently provide medical coverage for his son and pay Mr. Kerr 80% of the health
8 insurance contribution on his payroll check. This continued conduct by Mr. Sanders lends
9 further credibility to his testimony that he did not believe that the Agreement had been
10 accepted and become effective. Had he believed his son and Mr. Kerr were covered under the
11 Agreement, it is reasonable to conclude that he would have modified his conduct; specifically,
12 he would have likely discontinued providing alternative health insurance for his son and paying
13 Mr. Kerr 80% of the health insurance contribution.

14       In view of the foregoing, the Court concludes that there was not an enforceable
15 agreement between the parties for the period from July 1, 2004 to June 30, 2007 for coverage
16 other than for Mr. and Mrs. Sanders.

17       The Court is sympathetic to the position of the Trust Fund in this matter. Paragraph 1
18 of the Flat Rate Agreement expressly provides: "[t]he Employer agrees that it shall make
19 contributions for ALL its non-bargaining unit employees who work at least 80 hours or more
20 per month and acknowledge this is an obligation under this Agreement." Jt. Exh. 2, ¶ 1
21 (emphasis in original). This paragraph, on its own, clearly requires the employer to make
22 contributions on behalf of "ALL" its non-bargaining unit employees. However, Paragraph 1
23 cannot be read in a vacuum, *see Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983)
24 (holding that a written contract must be read as a whole), and an employer's obligation to
25 comply with Paragraph 1 cannot be triggered until the employer is notified in some fashion that

the agreement has been accepted by the Union and Board of Trustees and the Effective Date has occurred. *See* Jt. Exh. 2, ¶ 5; 1-3 CORBIN ON CONTRACTS § 3.13.

Acceptance of a contract can be proven by means expressly provided for in the contract as well as by conduct of the parties. Defendants received notice of the Agreement's acceptance by the Union and Trust Fund on or about September 2007 when Defendants received notice of the audit report. *See* Jt. Exh. No. 4. The audit report clearly signals that the Union believes that the Flat Rate Agreement was recommended and operative. Despite this clear acknowledgement that the Trust Fund and Union had accepted the Flat Rate Agreement, Schmuck Brothers' conduct did not change after September 2007. In other words, although Mr. Kerr retired, James Sanders remained a non-bargaining unit employee for whom contributions were due, owing, and unpaid. This is outside the relevant time period of this lawsuit, but this unjustifiable response was considered when accessing the credibility of Mr. Sanders. Ultimately, the Court has found Mr. Sanders to be credible, notwithstanding the legally indefensible failure to pay the flat rate amount for James Sanders after receipt of the audit report.

### III. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court orders that Plaintiff's complaint and this action are DISMISSED with prejudice. Defendants are awarded their costs.

DATED this 1st day of May, 2009.

*James P. Donohue*
_____
JAMES P. DONOHUE
United States Magistrate Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 10